# VIRGINIA

## IN THE CIRCUIT COURT FOR LOUDOUN COUNTY

SAEED MOHAMMADI and
FATEMEH ASSANGARI
10827 Monticello Drive
Great Falls, VA 22066

      Plaintiffs,

v.

                                    Case No.: _____

EMC MORTGAGE CORPORATION
2780 Lake Vista Drive
Lewisville, TX 75067-3884

      Serve: Private Process

US Bank, as Trustee to Bear Stearns
Asset Backed Certificates Series I, LLC 2006-AC2.

      SERVE: Registered Agent
      CT Corporation System
      4701 Cox Road, Ste 301
      Glen Allen, VA 23060-6802

And

EQUITY TRUSTEES, LLC,
a Virginia limited liability company
2020 North 14th Street, Suite 750
Arlington, VA 22201

      SERVE: Registered Agent:
      James M. Towarnicky, Esq.
      3977 Chain Bridge Road, Suite 1
      Fairfax, VA 22030

      Defendants.

## **COMPLAINT**

COME NOW, the Plaintiffs, Saeed Mohammadi and Fatemeh Assangari (hereinafter

"Plaintiff") by and through counsel and for their Complaint state as follows:

**EXHIBIT**

**A**

## PARTIES

1.  Plaintiff is a resident of the Commonwealth of Virginia, and is the lawful and sole title holder of 10827 Monticello Drive, Great Falls, VA 22066 (Loudoun County) (hereinafter, the "Property"), subject to a Deed of Trust securing First American Mortgage Inc. ("1st American").

2.  Defendant EMC MORTGAGE CORPORATION (hereinafter "EMC"), upon information and belief is a mortgage lender with its principal place of business located in Texas. Defendant EMC has a withdrawn corporate charter in Virginia but nonetheless regularly transacts business in the Commonwealth including representing itself as "Lender" in Loan Modification Agreements for mortgage loans located in Virginia.

3.  Defendant US Bank, as Trustee to Bears Stearns Asset Backed Certificates Series 2006-AC2 ("US Bank") is a federally chartered bank that was the purchaser of the Property at the unlawful foreclosure sale.

4.  Defendant EQUITY TRUSTEES, LLC (hereinafter "EQUITY") is a professional limited corporation existing and organized under the laws of the Commonwealth of Virginia. Defendant EQUITY's principal place of business is located in Arlington, VA. Defendant EQUITY is licensed to and regularly does transact business in the Commonwealth of Virginia.

## JURISDICTION AND VENUE

5.  This Court may exercise personal jurisdiction over Defendants in this action because they transacted business, including the transactions at issue in the present matter, within the Commonwealth of Virginia.

6.  Venue is appropriate in this Court pursuant to Virginia code 8.01-261(3)(b) because this suit concerns real property located in Fairfax County, Virginia.

2

## FACTS

7.  On November 30, 2005, Plaintiff purchased the Property.

8.  To effectuate the purchase, Plaintiff executed a promissory note and a deed of trust as a security interest on the property.

9.  At closing, Plaintiff signed a Promissory Note (Ex A) and a "Deed of Trust" (Ex B), which named 1ST AMERICAN as Lender.

10. The First Promissory Note was for the amount of $444,000.00.

11. After executing the loan documents, Plaintiff began making the loan payments to 1ST AMERICAN.

12. Plaintiff is the owner and sole title-holder of the Property, as evidenced by the aforementioned Deed of Trust in the land records, subject to a lien held by 1ST AMERICAN.

13. After experiencing difficulty making the mortgage payments in 2010, Plaintiff began receiving demands for payment and threats of foreclosure from Defendant EMC.

14. As soon as those demands for payment and threats of foreclosure started, Plaintiff was also sent notices indicating that EMC would work with Plaintiff in some type of foreclosure prevention program, including a loan modification.

15. As requested by EMC's correspondence, Plaintiff filed a loan modification application and attached all applicable documentation.

16. Following his loan modification request, EMC indeed placed Plaintiff in a loan modification trial program under the Home Affordable Modification Program ("HAMP") and sent Plaintiff a "Welcome Letter" advising Plaintiff that payments under the loan modification agreement would start on January 1, 2010, and that as long as he complied with all requirements he would be receive a permanent modification of his loan.

3

17. Plaintiff began paying under the HAMP Program (Step One of Two-Step Documentation Process) on January 1, 2010. The new payments under the Trial Period were for the amount of $1,937.50. Plaintiff made the required HAMP program payments to EMC each and every month on a timely basis.

18. In that Loan Modification package, EMC identified itself as the "Lender."

19. Plaintiff complied with all of the terms of the Trial Loan Modification Program, including submitting all documentation requested by EMC and fully expected to convert the trial period and payment into a permanent status.

20. Being aware that the HAMP loan program was supposedly scheduled to last only a 3-month trial period, Plaintiff eagerly contacted EMC on a regular basis to inquire about the status of the permanent loan modification.

21. EMC repeatedly told Plaintiff that his documents are "under review" and no permanent modification would be forthcoming until the "review" is completed.

22. Since the documentation for the permanent modification was not being sent, Plaintiff continued to call for updates on his case. EMC would always be "reviewing" Plaintiff's documentation. On several occasions, Plaintiff was informed that his modification was not going anywhere because "there was documentation missing."

23. For three months after entering the trial plan each and every time Plaintiff re-sent all documentation requested but EMC representatives nonetheless repeatedly indicated that the documentation had never arrived and / or had not been sent by Plaintiff.

24. Plaintiff showed proof of having sent the information and resent said documentation.

25. Plaintiff heard nothing from EMC after having addressed their repeated concerns of missing documentation.

26. Plaintiff remained in the plan for an additional three months, but heard nothing from EMC after having addressed their repeated concerns of missing documentation.

27. Plaintiff never missed making the loan modification payments that started January 1, 2010.

28. On 6.29.2010, just one day before the six-month anniversary of when the trial period started, EMC sent Plaintiff a letter informing Plaintiff that he did not qualify for a permanent loan modification because Plaintiff "did not provide [EMC] with the documents [EMC had] requested."

29. EMC misrepresented Plaintiffs' alleged failure to submit documentation so that EMC could fabricate a reason for denial of a permanent loan modification that was entirely arbitrary and untruthful.

30. EMC systematically slows or thwarts homeowners' requests to modify mortgages in order to collect higher fees and interest rates associated with distressed home loans.

31. Under the HAMP loan modifications from EMC, Plaintiff was prequalified for the program, and received a Temporary Payment Program ("TPP") contract requiring him to make three modified loan payments and, if Plaintiff had not already done so, to submit certain financial documentation.

32. Despite fulfilling these obligations under the TPP contracts with EMC, Plaintiff did not receive a permanent HAMP modification of their loan, nor did they receive timely written notifications explaining the reasons for Defendant's denial.

33. Once denied without a valid reason, Plaintiff immedialtely followed up and was told that the denial letter was issued because the "trial period and non-review" could not exceed 6 months under the HAMP program.

34. Then EMC informed Plaintiff that maybe he could qualify for the in-house Modification Program and requested that Plaintiff re-send documents again.

35. EMC placed Plaintiff in a more expensive "in-house" Loan Modification Program on July 8, 2010; only nine (9) days after denying the Plaintiff under the HAMP Program for Plaintiff's failure to qualify for the lower HAMP Program payments. The in-house program increased the monthly payment by over $600 over the denied HAMP Program and placed the Plaintiff in an unaffordable loan situation.

36. EMC did not act in good faith during the loan modification application process.

37. EMC as "Lender" had agreed to participate in the Government Sponsored program and received payments in the millions of dollars under that participation and originally claimed that Plaintiff had been qualified under the government sponsored HAMP program.

38. EMC informed Plaintiff that all documentation had not been received under the HAMP program and therefore the modification was denied; untruthfully stating that documentation was missing.

39. Eight (8) days later, EMC approves Plaintiff for an in-house loan modification at least $600 higher than the lower HAMP program that Plaintiff had qualified for originally.

40. By letter dated December 7, 2010 Equity Trustees ("Equity") advised Plaintiff on behalf of EMC that the loan was accelerated and it (Equity) was instructed to foreclose on January 7, 2011.

41. With the 12.7.2010 letter, Equity provided a copy of the document appointing an entity identified as EQUITY TRUSTEES as substitute trustee (Ex C – Appointment of Substitute Trustee). Said document was executed by EMC as "Servicing Agent" for Defendant US Bank, not as Lender as it had identified itself during the previous twelve months of modification review.

42. EMC held itself out as the Lender during all modification negotiations, yet a different entity appoints the substitute trustee revealing that EMC either never had authority to engage in modification discussions, or Plaintiff already had a binding modification as he met all the requisite terms (thus no default existed).

43. Only the Lender, or its successor, may appoint a substitute trustee.

44. US Bank was not the Lender or successor - EMC was the Lender per its own documents (See Ex D), and identified "Bear Stearns" as the owner by letter dated 1.7.11.

45. EMC breached its contract under the HAMP Program to Plaintiff so as generate higher fees for itself and in disregard of Plaintiff's reasonable reliance on the HAMP Program guidelines that Plaintiff had followed.

46. But for EMC's failure to timely process Plaintiffs' HAMP Program request, Plaintiff would not have been placed in any foreclosure proceedings as Plaintiff was able to make the HAMP Program payments on a regular and timely basis monthly.

47. Once the foreclosure took place the purchaser was Defendant US Bank. Defendant US Bank is conducting Unlawful Detainer proceedings on July 26, 2011. The judgment for possession was appealed to the Circuit Court and the bond was paid (CL00069015-00).

48. Plaintiffs , having complied with the terms of the HAMP program, were either not in default or EMC was not authorized to engage in modification discussions on the subject loan, does not own the Loan, and cannot provide evidence of who the actual owner of the loan is.

**COUNT I**
**WRONGFUL FORECLOSURE**
EMC, US Bank, Equity

49. Plaintiff realleges and incorporates by reference all paragraphs above, as though fully set forth in this cause of action.

7

50. Defendant EMC made an offer of modification to Plaintiff under the HAMP program, contingent upon nothing other than Plaintiff's compliance with certain terms.  Plaintiff met all of the required terms.

51. Despite Plaintiff met all required terms, EMC denied the modification based on a false assertion that all documents were not provided, then proceeded to request the trustee sell the Property, when there was no default – with no default no lawful foreclosure could occur.

52. Further, based on the above, neither EMC or US Bank was the proper party with authority to enforce the terms of the Deed of Trust, as only the party secured by the Deed of Trust may so act, thus the foreclosure is void.

53. Defendant Equity took orders from EMC, created, prepared and executed documents for EMC to create the appearance of authority for US Bank to appoint Equity as substitute trustee and invoke the power of sale, when in fact, these orders were coming from EMC, not through US Bank, and Equity was aware of this fact.

WHEREFORE, Plaintiff requests that the foreclosure be rescinded, the Trustees' Deed and all other unauthorized documents be struck from the land records, and these Defendants be ordered to pay compensatory damages to Plaintiffs for their costs, legal fees and other damages, and punitive damages if warranted by the evidence.

## COUNT II
### Remove Cloud On Title
### Va. Code §55-153
### (Against EMC and US Bank)

(To strike / remove the Deed of Appointment and any Deed of Sale from the land records)

54. Plaintiff realleges and incorporates by reference all paragraphs above, as though fully set forth in this cause of action.

55. Defendant US Bank had no right, title or interest, was not the secured party, and thus had no authority to appoint the substitute trustee, and neither EMC or US Bank had authority to invoke the power of sale.

56. Plaintiffs' title is superior to that of US Bank as they have a Deed among the land records in their favor which is not being challenged.

57. The only evidence of any interest of Defendant US Bank are the self-serving documents submitted to the land records by it or its agents.

58. One must prove their right to be in the title to real property.

59. Plaintiff is the only party to this matter that can prove legal and equitable ownership interest in the Property.

60. Defendants have created a cloud on Plaintiffs' title, in fact have attempted to take it from them, when they had no right to do so.

61. Deed of Appointment of Substitute Trustee and resulting Deed of Sale are unlawful, unauthorized, and must be removed from the land records.

62. Even were US Bank able, in equity, to demonstrate it was authorized to appoint the substitute trustee, there was no default given the loan mod agreement by EMC during the modification process. The appearance of a default was fabricated by EMC when it denied Plaintiffs their loan modification when no basis for the denial existed.

WHEREFORE, Plaintiff respectfully requests that this Court enter an Order directing the Land Records Clerk to remove/strike the Deed of Appointment of Substitute Trustee and resulting Deed of Sale from the land records as unlawful and unauthorized, and award reasonable attorney's fees and costs.

## COUNT III
### Declaratory Action - Possession / Ejectment
### (Versus US Bank)

9

63. Plaintiff realleges and incorporates by reference all paragraphs above, as though fully set forth in this cause of action.

64. This action will determine the rights of the parties to the Property.

65. Plaintiff asks this Court to issue a declaratory Order that Plaintiff is entitled to possession of the Property, in light of the unauthorized foreclosure of the Property.

WHEREFORE, as this Court has jurisdiction over the issue of possession, as well as title to the Property, Plaintiffs respectfully request that this Court stay the unlawful detainer action (CL00069015-00) or in the alternative void any judgment for possession and return possession to the Plaintiffs, award punitive damages for Defendants fraudulent actions, costs and attorney's fees and whatever other relief the Court deems appropriate.

SAEED MOHAMMADI and
FATEMEH ASSANGARI

By Counsel,

Brown, Brown & Brown, P.C.

By: _____
Christopher E. Brown, VSB#39852
R. Michael Smith, VSB#13493
6269 Franconia Rd
Alexandria, Virginia 22310
703.924.0223
Fax 703.924.1586
brownfirm@lawyer.com
*Counsel for Plaintiffs*

## EXHIBITS

Exhibit A - Note

Exhibit B - Deed of Trust

Exhibit C - Document Appointing EQUITY as Substitute Trustee

Exhibit D - Loan Mod with EMC

10

# EXHIBIT A

InterestFirst<sup>SM</sup> NOTE

MOHAMMADI
LOAN #: GB25720000
MIN:   10021800000158671

NOVEMBER 30, 2005        FAIRFAX                    VIRGINIA
[Date]                   [City]                     [State]
10827 MONTICELLO DRIVE, GREAT FALLS, VA 22066

[Property Address]

1.  BORROWER'S PROMISE TO PAY
       In return for a loan that I have received, I promise to pay U.S. $444,000.00           (this amount is called
"Principal"), plus interest, to the order of the Lender. The Lender is 1ST AMERICAN MORTGAGE,
INC.
                                                    .  I will make all payments under this Note in the form
of cash, check or money order.
       I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is
entitled to receive payments under this Note is called the "Note Holder."

2.  INTEREST
       Interest will be charged on unpaid principal until the full amount of Principal has been paid.  I will pay interest at a
yearly rate of  6.250  %.
       The interest rate required by this Section 2 is the rate I will pay both before and after any default described in
Section 6(B) of this Note.

3.  PAYMENTS
       (A) Time and Place of Payments
       I will make a payment every month.  This payment will be for interest only for the first  120   months, and then will
consist of principal and interest.
       I will make my monthly payment on the 1ST    day of each month beginning on JANUARY 1, 2006          .
I will make these payments every month until I have paid all of the principal and interest and any other charges described
below that I may owe under this Note.  Each monthly payment will be applied as of its scheduled due date, and if the payment
includes both principal and interest it will be applied to interest before Principal.  If, on  DECEMBER 1, 2035      , I still
owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
       I will make my monthly payments at  3926 PENDER DRIVE, 1ST FLOOR,
FAIRFAX, VA 22030                                                        or at a different place if
required by the Note Holder.
       (B) Amount of Monthly Payments
       My monthly payment will be in the amount of U.S. $ 2,312.50         for the first  120   months of this
Note, and thereafter will be in the amount of U.S. $ 3,245.32      .  The Note Holder will notify me prior to the date of
change in monthly payment.

4.  BORROWER'S RIGHT TO PREPAY
       I have the right to make payments of Principal at any time before they are due.  A payment of Principal only is known
as a "Prepayment."  When I make a Prepayment, I will tell the Note Holder in writing that I am doing so.  I may not designate a
payment as a Prepayment if I have not made all the monthly payments due under the Note.
       I may make a full Prepayment or partial Prepayments without paying a Prepayment charge.  The Note Holder will use
my Prepayments to reduce the amount of Principal that I owe under this Note.  However, the Note Holder may apply my
Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the
Principal amount of the Note.  If I make a partial Prepayment, there will be no changes in the due date of my monthly payment
unless the Note Holder agrees in writing to those changes.  However, if the partial Prepayment is made during the period when
my monthly payments consist only of interest, the amount of the monthly payment will decrease for the remainder of the term
when my payments consist only of interest as well as during the time that my payments consist of principal and interest.  If the
partial Prepayment is made during the period when my payments consist of principal and interest, the amount of my monthly
payment will not decrease; however, the principal and the interest required under this Note will be paid prior to the Maturity
Date.

GB25720000

**5.  LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me.  The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me.  If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**6.  BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of  15       calendar days after the date it is due, I will pay a late charge to the Note Holder.  The amount of the charge will be  5.000      % of my overdue payment of interest and/or principal and interest.  I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount.  That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law.  Those expenses include, for example, reasonable attorneys' fees.

**7.  GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8.  OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed.  Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things.  Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note.  The Note Holder may enforce its rights under this Note against each person individually or against all of us together.  This means that any one of us may be required to pay all of the amounts owed under this Note.

**9.  WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor and waive the benefit of the homestead exemption as to the Property described in the Security Instrument (as defined below). "Presentment" means the right to require the Note Holder to demand payment of amounts due.  "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10.  UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions.  In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note.  That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note.  Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

VIRGINIA Interest/First FIXED RATE NOTE – Single Family – Fannie Mae UNIFORM INSTRUMENT
DOCUK0471
DOC0M471.VTX   08/28/2005

Form 3271.47 1/01
(page 2 of 3)

G925720000

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

NOV 3 0 2005

- BORROWER   SAEED MOHAMMADI  - DATE -

*[Sign Original Only]*

# EXHIBIT B

AFTER RECORDING RETURN TO:
1ST AMERICAN
MORTGAGE, INC.

3926 PENDER DRIVE,
1ST FLOOR

FARIFAX, VA 22030
ATTN:   KATHERINE M.
        GONTSCHAROW

THIS INSTRUMENT PREPARED BY:
KATHERINE M.
GONTSCHAROW

1ST AMERICAN
MORTGAGE, INC.

3926 PENDER DRIVE,
1ST FLOOR

FARIFAX, VA 22030

_____

[Space Above This Line For Recording Data]

## DEED OF TRUST

MOHAMMADI
LOAN #: GR25720000
MIN:   1002180000000158671
PIN:   /82/C/8///474/

The following information, as further defined below, is provided in accordance with Virginia law:

This Deed of Trust is given by  SAEED MOHAMMADI AND FATEMEH
ASSANGARI, HUSBAND AND WIFE

as Borrower (trustor), to  JOHN J. ROMANO
as Trustee, for the benefit of Mortgage Electronic Registration Systems, Inc., as beneficiary.

DEFINITIONS
Words used in multiple sections of this document are defined below and other words are defined in Sections 3,
11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in
Section 16.
(A) "Security Instrument" means this document, which is dated NOVEMBER 30, 2005     , together with
all Riders to this document.
(B) "Borrower" is SAEED MOHAMMADI AND FATEMEH ASSANGARI,
HUSBAND AND WIFE

Borrower is the trustor under this Security Instrument.
(C) "Lender" is 1ST AMERICAN MORTGAGE, INC.

Lender is a  CORPORATION                                organized and existing under the laws of
VIRGINIA                       . Lender's address is   3926 PENDER DRIVE,
1ST FLOOR,  FAIRFAX, VA 22182
(D) "Trustee" is .JOHN J. ROMANO
Trustee (whether one or more persons) is a  Virginia resident and/or a United States- or Virginia-chartered
corporation whose principal office is located in Virginia. Trustee's address is   3926 PENDER
DRIVE, 1ST FLOOR, FAIRFAX, VA, 22030

VIRGINIA--Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3047 1/01      (page 1 of 14 pages)
DOCUKVA1
DOCUKVA1.VTX  03/28/2005

0825720000

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F) "Note" means the promissory note signed by Borrower and dated   NOVEMBER 30, 2005   . The Note states that Borrower owes Lender
FOUR HUNDRED FORTY-FOUR THOUSAND AND 00/100
Dollars (U.S. $  444,000.00   ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than   DECEMBER 1, 2035    .

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider    ☐ Condominium Rider        ☐ Second Home Rider
☐ Balloon Rider            ☒ Planned Unit Development Rider  ☐ Biweekly Payment Rider
☐ 1-4 Family Rider         ☐ Other(s) [specify]

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items" means those items that are described in Section 3.

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably

VIRGINIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3047 1/01        (page 3 of 14 pages)
DOCUKVA1
DOCUKVA1.VTX  09/26/2005

GM25720000

grants and conveys to Trustee, in trust, with power of sale, the following described property located in the
COUNTY                                    of  FAIRFAX                                    :
[Type of Recording Jurisdiction]            [Name of Recording Jurisdiction]
LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART
HEREOF.

which currently has the address of  10827 MONTICELLO DRIVE
                                     [Street]
GREAT FALLS                            , Virginia   22066                      ("Property Address"):
[City/County]                                       [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements,
appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be
covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as
the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by
Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for
Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but
not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but
not limited to, releasing and cancelling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to
grant and convey the Property and that the Property is unencumbered, except for encumbrances of record.
Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to
any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with
limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
     1.  Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.
Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any
prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items
pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency.
However, if any check or other instrument received by Lender as payment under the Note or this Security
Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the
Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash;
(b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is
drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or
(d) Electronic Funds Transfer.
     Payments are deemed received by Lender when received at the location designated in the Note or at such
other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender
may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan
current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver
of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but
Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment
is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold
such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within

VIRGINIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3047 1/01
DOCUKVA3
DOCUKVA3.VTX   08/28/2006                                                     (page 3 of 14 pages)

0825720000

a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2.   **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.   **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be

VIRGINIA–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                  Form 3047 1/01
DOCUKVA4
DOCUKVA4.VTX   08/25/2008                                                                        (page 4 of 14 pages)

GB28720000

paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.   Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.   Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower

VIRGINIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3047 1/01          (page 5 of 14 pages)
DOCUKVA5
DOCUKVA5.VTX   08/25/2008

GR25720000

obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.   Occupancy.  Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.   Preservation, Maintenance and Protection of the Property; Inspections.  Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8.   Borrower's Loan Application.  Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

VIRGINIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                Form 3047 1/01            (page 6 of 14 pages)
DOCUKVA6
DOCUKVA6.VTX   04/25/2005

0325720000

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

GR25720000

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling

VIRGINIA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT     Form 3047 1/01     (page 8 of 14 pages)
DOCUKVA8
DOCUKVA8.VTX   08/25/2008

that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to

0028720000

Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which

G828720000

payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law.

VIRGINIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3047 1/01
DOCUVA11                                                                     (page 11 of 14 pages)
DOCUVA11.VTX   03/23/2005

GB25720000

Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender or Trustee shall give to Borrower, the owner of the Property, and all other persons, notice of sale as required by Applicable Law. Trustee shall give public notice of sale by advertising, in accordance with Applicable Law, once a week for two successive weeks in a newspaper having general circulation in the county or city in which any part of the Property is located, and by such additional or any different form of advertisement the Trustee deems advisable. Trustee may sell the Property on the eighth day after the first advertisement or any day thereafter, but not later than 30 days following the last advertisement. Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by advertising in accordance with Applicable Law. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property with special warranty of title. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to discharge the expenses of executing the trust, including a reasonable commission to Trustee; (b) to discharge all taxes, levies, and assessment, with costs and interest if these costs have priority over the lien of this Security Instrument, including the due pro rata thereof for the current year; (c) to discharge in the order of their priority, if any, the remaining debts and obligations secured by this Security Instrument, and any liens of record inferior to this Security Instrument under which sale is made, with lawful interest; and, (d) the residue of the proceeds shall be paid to Borrower or Borrower's assigns. Trustee shall not be required to take possession of the Property prior to the sale thereof or to deliver possession of the Property to the purchaser at the sale.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to release this Security Instrument and shall surrender all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Substitute Trustee. Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

CR25720000

NOTICE: THE DEBT SECURED HEREBY IS SUBJECT TO CALL IN FULL OR THE TERMS THEREOF BEING MODIFIED IN THE EVENT OF SALE OR CONVEYANCE OF THE PROPERTY CONVEYED.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

NOV 3 0 2005

- BORROWER - SAEED MOHAMMADI - DATE -

NOV 3 0 2005

FATEMEH ASSANGARI - DATE -

VIRGINIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT     Form 3047 1/01     (page 13 of 14 pages)
DOCUKVA13
DOCUKVAD.VTX  04/25/2005

0325720000

[Space Below This Line For Acknowledgment]

COMMONWEALTH OF Virginia
COUNTY OF Fairfax

The foregoing instrument was acknowledged before me this NOV 3 0 2005 , by

Saeed Mohammadi & Fatemeh Assangan

_____
Signature: Notary Public

Serial Number, if any:
My Commission Expires:

VIRGINIA–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3047 1/01          (page 14 of 14 pages)
DOCUKVA4
DOCUKVA4.VTX   08/25/2005

G825720000

If Lender exercises this option, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument.  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

NOV 3 0 2005

− BORROWER − SAEED MOHAMMADI − DATE −

*[Sign Original Only]*

VIRGINIA Interest First FIXED RATE NOTE − Single Family − Fannie Mae UNIFORM INSTRUMENT
DOCUM473
DOCUM473.VFX   03/22/2005

Form 3271.47 1/01
*(page 3 of 3)*

# EXHIBIT C

| PREPARED BY | Tax I.D.#<br>BGWW#: 119994 |
|---|---|

AFTER RECORDING, PLEASE RETURN TO:
Bierman, Geesing, Ward & Wood, LLC
4520 East West Highway, Suite 200
Bethesda, MD 20814

## DEED OF APPOINTMENT OF SUBSTITUTE TRUSTEE

THIS DEED OF APPOINTMENT OF SUBSTITUTE TRUSTEE, is made this **29** day of **November** 2010, by and among U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR CERTIFICATEHOLDERS OF BEAR STEARNS ASSET BACKED SECURITIES I LLC, ASSET BACKED CERTIFICATES, SERIES 2006-AC2 ("U.S. BANK NATIONAL ASSOCIATION"), party of the first part, and EQUITY TRUSTEES, LLC., a Virginia Limited Liability Company of 2020 N. 14th Street, Suite 750, Arlington, VA 22201 ("Substitute Trustees"), party of the second part.

WHEREAS, Saeed Mohammadi and Fatemeh Assangari by Deed of Trust dated November 30, 2005, and recorded prior hereto in the Office of the Clerk of the Circuit Court for Loudoun County, Virginia did grant and convey certain real estate known as:

LOT 474 SECTION SIX, GREAT FALLS FOREST, AS THE SAME APPEARS DULY DEDICATED, PLATTED AND RECORDED IN DEED BOOK 883 AT PAGE 1705, AMONG THE LAND RECORDS OF LOUDOUN COUNTY, VIRGINIA. BEING THE SAME PROPERTY WHICH, BY DEED DATED SEPTEMBER 19, 2003, AND RECORDED SEPTEMBER 22, 2003 AMONG THE LAND RECORDS OF THE COUNTY OF LOUDOUN, COMMONWEALTH OF VIRGINIA, INSTRUMENT NO. 20030922-0123855, WAS GRANTED AND CONVEYED BY KURT G. EGGER AND SHANNON A. MAHER UNTO TROY D. BARTON AND MICHAEL S. FENTRESS.

Known as: 10827 Monticello Drive, Great Falls, VA 22066

in trust, to secure to 1st American Mortgage, Inc., payment of a note ("Note") of even date therewith in the original principal amount of $444,000.00; and

WHEREAS, said Deed of Trust provides that the holder of the Note shall have the power and authority to appoint substitute trustee(s) in the place and stead of the trustee(s) named therein; and

WHEREAS, the party of the first part is the owner and holder of the note secured by said Deed of Trust.

NOW, THEREFORE WITNESSETH, in consideration of the sum of Ten Dollars ($10.00), and other good and valuable consideration, the party of the first part by the execution and delivery of these presents, hereby appoint Equity Trustees, LLC, a Virginia Limited Liability Company, as Substitute Trustees under the said Deed of Trust in the place and stead of JOHN J. ROMANO the Trustee or Trustees originally named therein, or in place of any other trustee or trustees who have heretofore been substituted for the originally named trustee or trustees, the said substitute trustees being vested with all of the right, title and interest and clothed with all the rights, powers and privileges of the Trustee or Trustees originally named in said Deed of Trust.



BGWW#: 119994

IN WITNESS WHEREOF, U.S. Bank National Association, as Trustee for Certificateholders of Bear Stearns Asset Backed Securities I LLC, Asset Backed Certificates, Series 2006-AC2 has caused this Deed of Appointment of Substitute Trustee to be executed on 29 day of November, 2010 by the authorized agent of EMC Mortgage Corporation.

U.S. Bank National Association, as Trustee for Certificateholders of Bear Stearns Asset Backed Securities I LLC, Asset Backed Certificates, Series 2006-AC2

By: EMC Mortgage Corporation, as Servicing Agent

Tonia Y. McFadden-Williams          Vice President

STATE OF _____ Ohio _____ )
COUNTY OF _____ Franklin _____ ) ) ss.

I, _____ Richard H. Eubanks _____ , a Notary Public in and for the State and County aforesaid, do hereby certify that _____ Tonia Y. McFadden-Williams _____ , authorized agent of EMC Mortgage Corporation, Authorized Servicing Agent for U.S. Bank National Association, as Trustee for Certificateholders of Bear Stearns Asset Backed Securities I LLC, Asset Backed Certificates, Series 2006-AC2, personally appeared before me in the jurisdiction aforesaid and executed the foregoing Deed of Appointment of Substitute Trustee.

Given under my hand and seal this 29 day of November, 2010.

Notary Public

My Commission Expires:



RICHARD H. EUBANKS
Notary Public, State of Ohio
My Comm. Expires May 12, 2015

# EXHIBIT D

Loan Number 0013152525

Investor Loan # 13152525

# HOME AFFORDABLE MODIFICATION TRIAL PERIOD PLAN
## (Step One of Two-Step Documentation Process)

Trial Period Plan Effective Date: **JANUARY 01, 2010**
Borrower ("I")[1]: **SAEED MOHAMMADI**
Lender or Servicer ("Lender"): **EMC MORTGAGE CORPORATION**
Date of first lien mortgage, deed of trust, or security deed ("Mortgage") and Note ("Note"): November 30, 2005
Loan Number: 0013152525
Property Address ("Property"): **10827 MONTICELLO DRIV, GREAT FALLS, VIRGINIA 22066**

If I am in compliance with this Trial Period Plan (the "Plan") and my representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Home Affordable Modification Agreement ("Modification Agreement"), as set forth in Section 3, that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage. The Mortgage and Note together, as they may previously have been amended, are referred to as the "Loan Documents." Capitalized terms used in this Plan and not defined have the meaning given to them in the Loan Documents.

If I have not already done so, I am providing confirmation of the reasons I cannot afford my mortgage payment and documents to permit verification of all of my income (except that I understand that I am not required to disclose any child support or alimony unless I wish to have such income considered) to determine whether I qualify for the offer described in this Plan (the "Offer"). I understand that after I sign and return one copy of this Plan to the Lender, the Lender will review my modification package and send me written notice if I do not qualify for the Offer.

1.  **My Representations.** I certify, represent to Lender and agree:

    A.  I am unable to afford my mortgage payments for the reasons indicated in my Hardship Affidavit and as a result, (i) I am either in default or believe I will be in default under the Loan Documents in the near future, and (ii) I do not have sufficient income or access to sufficient liquid assets to make the monthly mortgage payments now or in the near future;

    B.  I live in the Property as my principal residence, and the Property has not been condemned;

    C.  There has been no change in the ownership of the Property since I signed the Loan Documents;

    D.  I am providing or already have provided documentation for all income that I receive (and I understand that I am not required to disclose any child support or alimony that I receive, unless I wish to have such income considered to qualify for the Offer);

    E.  Under penalty of perjury, all documents and information I have provided to Lender pursuant to this Plan, including the documents and information regarding my eligibility for the program, are true and correct; and

    F.  If Lender requires me to obtain credit counseling, I will do so.

    G.  If I was discharged in a Chapter 7 bankruptcy proceeding subsequent to the execution of the Loan Documents, Lender agrees that I will not have personal liability on the debt pursuant to this Agreement.

---

[1] If there is more than one Borrower or Mortgagor executing this document, each is referred to as "I". For purposes of this document words signifying the singular (such as "I") shall include the plural (such as "we") and vice versa where appropriate.

HOME AFFORDABLE MODIFICATION TRIAL PERIOD PLAN – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3156    3/09 (rev. 8/09) [CHP modified] *(page 1 of 4 pages)*



Loan Number 0013152525

2. **The Trial Period Plan.** On or before each of the following due dates, I will pay the Lender the amount set forth below ("Trial Period Payment"), which includes payment for Escrow Items, including real estate taxes, insurance premiums and other fees, if any, of U.S. **$1,937.50.**

| Trial Period Payment # | Trial Period Payment | Due Date On or Before |
|---|---|---|
| 1* | $1,937.50 | 01/01/2010 |
| 2 | $1,937.50 | 02/01/2010 |
| 3 | $1,937.50 | 03/01/2010 |

The Trial Period Payment is an estimate of the payment that will be required under the modified loan terms, which may be finalized in accordance with Section 3 below. The actual payments under the modified loan terms, however, may be different.

*I understand that my first payment and this signed Trial Period Plan must be received by the Lender no later than JANUARY 01, 2010 or I may not be accepted into the Home Affordable Modification Program.

I agree that during the period (the "Trial Period") commencing on the Trial Period Effective Date and ending on the earlier of: (i) the first day of the month following the month in which the last Trial Period Payment is due (the "Modification Effective Date") or (ii) termination of this Plan, I understand and acknowledge that:

A. TIME IS OF THE ESSENCE under this Plan. This means I must make all payments on or before the days that they are due;

B. Except as set forth in Section 2.C. below, the Lender will suspend any scheduled foreclosure sale, provided I continue to meet the obligations under this Plan, but any pending foreclosure action will not be dismissed and may be immediately resumed from the point at which it was suspended if this Plan terminates, and no new notice of default, notice of intent to accelerate, notice of acceleration, or similar notice will be necessary to continue the foreclosure action. All rights to such notices are hereby waived by me to the extent permitted by applicable law;

C. If my property is located in Georgia, Hawaii, Missouri, or Virginia and a foreclosure sale is currently scheduled, the foreclosure sale will not be suspended and the Lender may foreclose if I have not made each and every Trial Period Payment that is due through the end of the month preceding the month in which the foreclosure sale is scheduled to occur. If a foreclosure sale occurs pursuant to this Section 2.C., this Plan shall be deemed terminated;

D. The Lender will hold the payments received during the Trial Period in a non-interest bearing account until they total an amount that is enough to pay my oldest delinquent monthly payment on my loan in full. I understand the Lender will not pay me interest on the amounts held in the account. If there is any remaining money after such payment is applied, such remaining funds will be held by the Lender and not posted to my account until they total an amount that is enough to pay the next oldest delinquent monthly payment in full;

E. When the Lender accepts and posts a payment during the Trial Period it will be without prejudice to, and will not be deemed a waiver of, the acceleration of the loan or foreclosure action and related activities and shall not constitute a cure of my default under the Loan Documents unless such payments are sufficient to completely cure my entire default under the Loan Documents;

F. If prior to the Modification Effective Date, (i) the Lender does not provide me a fully executed copy of this Plan and the Modification Agreement; (ii) I have not made the Trial Period payments required under Section 2 of this Plan; (iii) the Lender determines that any of my representations in Section 1 were not true and correct as of the date I signed this Plan or are no longer true and correct at any time during the Trial Period; or (iv) I do not provide all information and documentation required by Lender, the Loan Documents will not be modified and this Plan will terminate. In this event, the Lender will have all of the rights and remedies provided by the Loan Documents, and any payment I make under this Plan shall be applied to amounts I owe under the Loan Documents and shall not be

HOME AFFORDABLE MODIFICATION TRIAL PERIOD PLAN – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3156   3/09 (rev. 8/09) (CHF modified) *(page 2 of 4 pages)*



Loan Number 0013152525

refunded to me; and

G.  I understand that this Plan is not a modification of the Loan Documents and that the Loan Documents will not be modified unless and until (i) I meet all of the conditions required for modification, (ii) I receive a fully executed copy of a Modification Agreement, and (iii) the Modification Effective Date has passed. I further understand and agree that the Lender will not be obligated or bound to make any modification of the Loan Documents if the Lender determines that I do not qualify or if I fail to meet any one of the requirements under this Plan If, under the Lender's procedures, a title endorsement(s) and/or subordination agreement(s) are required to ensure that the modified Loan Documents retain first lien position and are fully enforceable, I understand and agree that the Lender will not be obligated or bound to make any modification of the Loan Documents or to execute the Modification Agreement if the Lender has not received an acceptable title endorsement(s) and/or subordination agreement(s) from other lien holders, as Lender determines necessary.

3.  **The Modification.** I understand that once Lender is able to determine the final amounts of unpaid interest and any other delinquent amounts (except late charges) to be added to my loan balance and after deducting from my loan balance any remaining money held at the end of the Trial Period under Section 2.D. above, the Lender will determine the new payment amount. If (1) my representations in Section 1 were and continue to be true in all material respects; (2) I comply with the requirements in Section 2; (3) I provide the Lender with all required information and documentation; and (4) the Lender determines that I qualify, the Lender will send me a Modification Agreement for my signature which will modify my Loan Documents as necessary to reflect this new payment amount and waive any unpaid late charges accrued to date. The Modification Agreement will provide that, as of the Modification Effective date, a buyer or transferee of the Property will not be permitted, under any circumstance, to assume the loan unless permitted by applicable State or Federal law, rules or regulations. This Plan shall terminate the day before the Modification Effective Date and the Loan Documents, as modified by a fully executed Modification Agreement, shall govern the terms between the Lender and me for the remaining term of the loan. . Provided I make timely payments during the Trial Period and both the Lender and I execute the Modification Agreement, I understand that my first modified payment will be due on the Modification Effective Date (i.e., on the first day of the month following the month in which the last Trial Period Payment is due).

4.  **Additional Agreements.** I agree to the following:

A.  That all persons who signed the Loan Documents or their authorized representative(s) have signed this Plan, unless (i) a borrower or co-borrower is deceased; (ii) the borrower and co-borrower are divorced and the property has been transferred to one spouse in the divorce decree, the spouse who no longer has an interest in the property need not sign this Plan (although the non-signing spouse may continue to be held liable for the obligation under the Loan Documents); or (iii) the Lender has waived this requirement in writing.

B.  To comply, except to the extent that they are modified by this Plan, with all covenants, agreements, and requirements of the Loan Documents, including my agreement to make all payments of taxes, insurance premiums, assessments, Escrow Items, impounds, and all other payments, the amount of which may change periodically over the term of my loan.

C.  If Lender may establish an escrow account under applicable law, this Plan constitutes notice that the Lender's waiver as to payment of Escrow Items, if any, has been revoked, I have been advised of the amount needed to fund my escrow account and I agree to the establishment of an escrow account. If the Loan Documents do not currently have escrow account provisions that govern, among other things, the collection, posting and payment of Escrow Items to and from the escrow account, the Lender will include provisions in my Modification Agreement that are similar to the escrow account provisions in the Fannie Mae/Freddie Mac Uniform Instrument for the state in which I live.

D.  That all terms and provisions of the Loan Documents remain in full force and effect; nothing in this Plan shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents.

E.  That I will execute such other and further documents as may be reasonably necessary to either (i) consummate the terms and conditions of this Plan; or (ii) correct the terms and conditions of this Plan



1+E-EMC+0013152525+H2A+48+3+4K

Loan Number 0013152525

if an error is discovered.

F.  That Lender will collect and record personal information, including, but not limited to, my name, address, telephone number, social security number, credit score, income, payment history, government monitoring information, and information about account balances and activity. I understand and consent to the disclosure of my personal information and the terms of this Trial Period Plan and the Modification Agreement by Lender to (a) the U.S. Department of the Treasury, (b) Fannie Mae and Freddie Mac in connection with their responsibilities under the Home Affordability and Stability Plan; (c) any investor, insurer, guarantor or servicer that owns, insures, guarantees or services my first lien or subordinate lien (if applicable) mortgage loan(s); (d) companies that perform support services for the Home Affordable Modification Program and the Second Lien Modification Program; and (e) any HUD certified housing counselor.

G.  That, as of the Trial Period Plan Effective Date, I understand that the Lender will only allow the transfer and assumption of this Trial Period Plan to a transferee of my property in the case of my death, divorce or marriage to the same extent as permitted under the Garn St. Germain Act, 12 U.S.C. Section 1701j-3. This Plan may not, under any other circumstances, be assigned to, or assumed by, a buyer or transferee of the Property.

In Witness Whereof, the Lender and I have executed this Plan.

_____ (Seal)     Date: _____/_____/_____
X
Borrower -  **SAEED MOHAMMADI**



1 * E - E M C * 0 0 1 3 1 5 2 5 2 5 + H 2 A + 4 8 + 4 + 4 1

DATE STAMP
& RETURN

VIRGINIA:

IN THE CIRCUIT COURT FOR LOUDOUN COUNTY

SAEED MOHAMMADI and
FATEMEH ASSANGARI,

Plaintiffs,

v.

Case No. 71636

EMC MORTGAGE CORPORATION,
US BANK, as Trustee to Bear Stearns
Asset Backed Certificates Series I, LLC 2006-AC2, and
EQUITY TRUSTEES, LLC,

Defendants.

## DEFENDANTS' MOTION FOR EXTENSION OF TIME
## TO FILE RESPONSIVE PLEADINGS

Defendant US Bank, through counsel, pursuant to Virginia Supreme Court Rules 1:9 and 3:8 files this motion for a thirty-day extension of time to file its responsive pleadings in this matter. Undersigned counsel was retained to represent US Bank and received the transmittal of service of the Complaint on US Bank in this matter very recently, on the evening of Friday, February 17, and the responsive pleading was due on Tuesday, February 21. Counsel has not yet had sufficient time to review the matter and identify potential defenses that Defendant may have in this action. The requested extension would not cause any prejudice to any party, as this case recently has been commenced, and Defendant EMC Mortgage Corporation has yet to be served. The length of the delay caused by any extension is minimal and will not cause any prejudice to any party or impact the Court's scheduling in this matter, as discovery has not yet commenced

and trial has not yet been scheduled.  Accordingly, the ends of justice would be served by permitting a 30-day extension of time.

Pursuant to Virginia Supreme Court Rule 4:15(b), undersigned counsel certifies that counsel has made a reasonable effort to confer with counsel for Plaintiffs before filing this motion. Counsel contacted Plaintiff's counsel on multiple occasions on Monday, February 20 (President's Day) and February 21, but was unable to reach agreement regarding an extension prior to filing this motion.  Counsel for Defendant will continue to communicate with counsel for Plaintiffs regarding the resolution of this Motion.

WHEREFORE, Defendant respectfully requests that this Motion for Extension of Time to File Responsive Pleadings be granted.

Dated: February 22, 2012

Virginia W. Hoptman (VSB #65565)
Lesley Whitcomb Fierst (VSB #79337)
WOMBLE CARLYLE SANDRIDGE & RICE, PLLC
8065 Leesburg Pike, 4th Floor
Tysons Corner, VA  22182-2738
Telephone:    703-790-3310
Facsimile:     703-790-2623
vhoptman@wcsr.com
lfierst@wcsr.com
Counsel for Defendant US Bank

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of this Motion for Extension of Time to File Responsive Pleadings was served by U.S. mail, postage prepaid, and electronic mail this 22nd day of February, 2012, upon the following:

> Christopher E. Brown
> R. Michael Smith
> 6269 Franconia Rd.
> Alexandria, VA 22310
> brownfirm@lawyer.com

Virginia W. Hoptman

**VIRGINIA:**

IN THE CIRCUIT COURT OF LOUDOUN COUNTY

Saeed Mohammadi and Fatemeh Assangari

Vs.

EMC Mortgage Corporation, et al _____   Case # _____ 71636 _____

## PRAECIPE

The Court is hereby requested to place the above styled matter on the:

✓ Civil Motions Docket
*1ˢᵗ Friday of each month
*Civil Scheduling @ 9:00 a.m.
*Former Chancery cases @ 10:00 a.m.
 (divorce, adoption, for example)
*Former Law cases @ 2:00 p.m.
 (property, contracts, money
 judgments, for example)

_____ Criminal Motions Docket
*4ᵗʰ Friday of each month
*9:00 a.m.
*Criminal Scheduling at 9:00 a.m.

_____ Ore Tenus Docket (Uncontested Divorces)
*1ˢᵗ Friday of each month
*9:00 a.m.

_____ Scheduling Docket
*9:00 a.m.
*Every Monday
*This is to set a hearing date

_____ Habitual Offender/Driver's License Docket
*2ⁿᵈ Friday of each month
*1:00 p.m.
*Includes petitions for restoration/restricted OL's,
 show causes and ASAP violations

for the   6th   day of _____ April _____, 2012   at   10:00   a.m./p.m. for the
purpose of:   Defendant's Motion for Extension of Time to File Responsive Pleading
_____

Given under my hand this  22nd  day of _____ February _____, 2012 .

Name: _____ Virginia Whitner Hoptman _____

Phone: _____ (703) 394-2230 _____

## CERTIFICATE

I hereby certify that I have delivered a true copy of this praecipe to all counsel of record herein
pursuant to the provisions of Rule 1:12 of the Rules of the Supreme Court of Virginia, and served a
true copy upon parties not represented by counsel, if any this
 22nd day of _____ February _____, 2012   by: (check one) _____ HAND DELIVERY
 X MAIL or _____ FACSIMILIE Note: Delivery by mail or facsimile may not always be
sufficient notice in a case. If this case is being placed on the Civil Motions Docket, I certify that I
have in good faith conferred or attempted to confer with the other affected parties in an effort to
resolve the dispute without court action.

_____
Signature

LOUDOUN COUNTY CIRCUIT COURT - CIVIL
18 E MARKET ST/PO BOX 550
LEESBURG, VIRGINIA 20178-0550
(703) 777-0270

TO: EQUITY TRUSTEES LLC                    CASE NO.  107CL00071636-00
    SERVE: STEVEN B WOOD; REG AGT
    8100 THREE CHOPT RD; STE 240


    RICHMOND,VA 23229


                          SUMMONS


THE PARTY UPON WHOM THIS SUMMONS AND THE ATTACHED COMPLAINT ARE SERVED IS
HEREBY NOTIFIED THAT UNLESS WITHIN 21 DAYS AFTER SUCH SERVICE, RESPONSE IS
MADE BY FILING IN THE CLERK'S OFFICE OF THIS COURT A PLEADING IN WRITING,
IN PROPER LEGAL FORM, THE ALLEGATIONS AND CHARGES MAY BE TAKEN AS ADMITTED
AND THE COURT MAY ENTER AN ORDER, JUDGMENT OR DECREE AGAINST SUCH PARTY
EITHER BY DEFAULT OR AFTER HEARING EVIDENCE.

APPEARANCE IN PERSON IS NOT REQUIRED BY THIS SUMMONS.

DONE IN THE NAME OF THE COMMONWEALTH OF VIRGINIA ON FEBRUARY 13, 2012.

CLERK: GARY M CLEMENS

                          BY:  _Sandra Amundson_____
                               CLERK/DEPUTY CLERK



ATTORNEY:  BROWN, CHRISTOPHER
           6269 FRANCONIA RD
           703-924-0223
           ALEXANDRIA,VA 22310

**V I R G I N I A:**

## IN THE CIRCUIT COURT FOR LOUDOUN COUNTY

| | |
|---|---|
| SAEED MOHAMMADI, et al. | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| ·vs. | )  Case No. CL 71636 |
| | ) |
| EMC MORTGAGE CORPORATION, et | ) |
| al. | ) |
| | ) |
| Defendants. | ) |

### DEMURRER

COMES NOW Defendant Equity Trustees, LLC ("Equity"), by and through undersigned counsel, and moves this Court to sustain this demurrer without leave to amend and dismiss the Complaint with prejudice because (1) the Complaint fails to state a claim upon which relief may be granted and (2) the Complaint fails to allege facts that could give rise to a claim for which relief can be granted. Permitting further amendment would be futile and would substantially prejudice all of the Defendants.

WHEREFORE upon the grounds above assigned, those included in any supporting memoranda and those advanced at oral argument, Defendants move this Court to:

(i) Sustain its demurrer and dismiss this action with prejudice;

(ii) Order the release of any related Memorandum of Lis Pendens which may have been recorded in the county land records;

(iii) Award Equity its attorney's fees and costs incurred in defending against this matter; and

(iv) Grant any other relief the Court deems appropriate.

Respectfully submitted,

_Allison Melton_

Allison Melton, VSB No. 75192
Stephen B. Wood, VSB No. 26518
BWW LAW GROUP, LLC
4520 East West Highway, Suite 200
Bethesda, MD 20814
Tel. (301) 961-6555 x4040
Fax (703) 657-6458
*Counsel for Equity Trustees, LLC*

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and accurate copy of the foregoing Demurrer was served by U.S. Mail, first class, postage pre-paid, the 7th day of February, 2012 to:

Christopher E. Brown
Brown, Brown & Brown, P.C.
6269 Franconia Road
Alexandria, Virginia 22310

_Allison Melton_

Allison Melton, VSB No. 75192

IMAGE



02 1P
0003980589  FEB 07  2012
MAILED FROM ZIP CODE 22201
$ 000.45⁰
PITNEY BOWES

BWW Law Group, LLC
2020 N 14th Street
Suite 750
Arlington, VA 22201

Christopher E. Brown
Brown, Brown & Brown, P.C.
6269 Franconia Road
Alexandria, VA 22310



UNITED STATES POSTAGE
PITNEY BOWES
$ 000.45⁰
02 1P          FEB 07 2012
0003980589
MAILED FROM ZIP CODE 22201

Allison Melton, Esq.
BWW Law Group, LLC
2020 N 14th Street, Suite 750
Arlington, VA 22201

BWW Law Group, LLC
2020 N 14th Street
Suite 750
Arlington, VA 22201

UPS Internet Shipping: Shipment Label | FOR UPS SHIPPING ONLY | Page 1 of 1

### UPS Internet Shipping: View/Print Label

1. **Ensure there are no other shipping or tracking labels attached to your package.** Select the Print button on the print dialog box that appears. Note: If your browser does not support this function select Print from the File menu to print the label.

2. **Fold the printed sheet containing the label at the line so that the entire shipping label is visible.** Place the label on a single side of the package and cover it completely with clear plastic shipping tape. Do not cover any seams or closures on the package with the label. Place the label in a UPS Shipping Pouch. If you do not have a pouch, affix the folded label using clear plastic shipping tape over the entire label.

3. **GETTING YOUR SHIPMENT TO UPS**

   **UPS locations include the UPS Store®, UPS drop boxes, UPS customer centers, authorized retail outlets and UPS drivers.**

   Find your closest UPS location at: www.ups.com/dropoff

   Take your package to any location of The UPS Store®, UPS Drop Box, UPS Customer Center, UPS Alliances (Office Depot® or Staples®) or Authorized Shipping Outlet near you. Items sent via UPS Return Services(SM) (including via Ground) are also accepted at Drop Boxes. To find the location nearest you, please visit the 'Find Locations' Quick link at ups.com.

   **Customers with a Daily Pickup**
   Your driver will pickup your shipment(s) as usual.

FOLD HERE

1 OF 1

0.0 LBS LTR

BETTYANN GIBBS
703-657-4448
BWW LAW GROUP, LLC
2020 N 14TH STREET, SUITE 750
ARLINGTON VA 22201

SHIP TO:
CLERK-CIVIL DIVISION
LOUDOUN COUNTY CIRCUIT COURT
18 EAST MARKET STREET
LEESBURG VA 20176-2828

VA 220 9-32

2

UPS 2ND DAY AIR
TRACKING #: 1Z FZX 310 02 9676 3733

BILLING: P/P

UPS 14.0.25.          W2ZSED 24.0A 01/2012

VIRGINIA:

## IN THE CIRCUIT COURT FOR LOUDOUN COUNTY

| | |
|---|---|
| SAEED MOHAMMADI, et al. | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) Case No. CL 7163@ |
| | ) |
| EMC MORTGAGE CORPORATION, et al. | ) |
| | ) |
| Defendants. | ) |

2012 FEB 22  AM 11: 51

CIRCUIT COURT
CLERK'S OFFICE
LOUDOUN COUNTY, VA.
BY_____.D.C.

## <u>DEMURRER</u>

COMES NOW Defendant US Bank, as Trustee to Bear Stearns Asset Backed Certificates Series I, LLC 2006-AC2 ("US Bank"), by and through undersigned counsel, and moves this Court to sustain this demurrer without leave to amend and dismiss the Complaint with prejudice because (1) the Complaint fails to state a claim upon which relief may be granted and (2) the Complaint fails to allege facts that could give rise to a claim for which relief can be granted. Permitting further amendment would be futile and would substantially prejudice all of the Defendants.

WHEREFORE upon the grounds above assigned, those included in any supporting memoranda and those advanced at oral argument, US Bank moves this Court to:

(i) Sustain its demurrer and dismiss this action with prejudice;

(ii) Order the release of any related Memorandum of Lis Pendens which may have been recorded in this jurisdiction;s land records;

(iii) Award the Defendants their attorney's fees and costs incurred in defending against this matter; and

(iv) Grant any other relief the Court deems appropriate.

Respectfully submitted,

_Allison Melton_

Allison Melton, VSB No. 75192
Stephen B. Wood, VSB No. 26518
BWW LAW GROUP, LLC
4520 East West Highway, Suite 200
Bethesda, MD 20814
Tel. (301) 961-6555 x4040
Fax (703) 657-6458
*Counsel for US Bank, as Trustee to Bear*
*Stearns Asset Backed Certificates Series I, LLC*
*2006-AC2*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and accurate copy of the foregoing Demurrer was served by email and U.S. Mail, first class, postage pre-paid, the 21st day of February, 2012 to:

Christopher E. Brown
Brown, Brown & Brown, P.C.
6269 Franconia Road
Alexandria, Virginia 22310
Email: brownfirm@gmail.com

_Allison Melton_

Allison Melton, VSB No. 75192

VIRGINIA:

## IN THE CIRCUIT COURT FOR LOUDOUN COUNTY

| | | |
|---|---|---|
| SAEED MOHAMMADI, et al. | ) | 2012 FEB 22  AM 11: 51 |
| | ) | |
| Plaintiffs, | ) | CIRCUIT COURT |
| | ) | CLERKS OFFICE |
| vs. | ) | LOUDOUN COUNTY VA. |
| | ) | Case No. CL 71636 00  BY_____.D.C. |
| EMC MORTGAGE CORPORATION, et | ) | |
| al. | ) | |
| | ) | |
| Defendants. | ) | |

## CONSENT ORDER EXTENDING TIME TO FILE RESPONSIVE PLEADING

COMES NOW Defendant US Bank, as Trustee to Bear Stearns Asset Backed Certificates Series I, LLC 2006-AC2 ("US Bank"), by and through undersigned counsel, pursuant to Virginia Supreme Court Rule 1:9, and moves this Honorable Court for an extension of time to file a responsive pleading to the Complaint filed by Plaintiffs in the above-styled action. Upon the agreement of all counsel of record, as demonstrated by their signatures to this Order appearing below it is ORDERED that

1. US Bank is granted an extension of time to file an responsive pleading to the Complaint filed in this matter; and

2. US Bank shall file its responsive pleading to the Complaint with the Court on or before February 24, 2012.

Entered this _____ day of _____, 2012.

_____
Circuit Court Judge

I ASK FOR THIS:

_Allison Melton_

Allison Melton, VSB No. 75192
Stephen B. Wood, VSB No. 26518
BWW LAW GROUP, LLC
4520 East West Highway, Suite 200
Bethesda, MD 20814
Tel. (301) 961-6555 x4040
Fax (703) 657-6458
*Counsel for Defendant US Bank, as Trustee to
Bear Stearns Asset Backed Certificates Series
I, LLC 2006-AC2*


SEEN AND AGREED:

_Allison M_ on behalf of
Christopher E. Brown, with permission in writing
(see attached signature)
Christopher E. Brown
R. Michael Smith
BROWN, BROWN & BROWN, PC
6269 Franconia Road
Alexandria, Virginia 22310
Phone: 703-924-0223
*Counsel for Plaintiffs Saeed Mohammadi and
Fatemeh Assangari*


SEEN AND AGREED:

_Allison Melton_

Allison Melton, VSB No. 75192
Stephen B. Wood, VSB No. 26518
BWW LAW GROUP, LLC
4520 East West Highway, Suite 200
Bethesda, MD 20814
Tel. (301) 961-6555 x4040
Fax (703) 657-6458
*Counsel for Defendant Equity Trustees, LLC*

I ASK FOR THIS:

_____

Allison Melton, VSB No. 75192
Stephen B. Wood, VSB No. 26518
BWW LAW GROUP, LLC
4520 East West Highway, Suite 200
Bethesda, MD 20814
Tel. (301) 961-6555 x4040
Fax (703) 657-6458
*Counsel for Defendant US Bank, as Trustee to*
*Bear Stearns Asset Backed Certificates Series*
*I, LLC 2006-AC2*

SEEN AND AGREED:

_____

Christopher E. Brown
R. Michael Smith
BROWN, BROWN & BROWN, PC
6269 Franconia Road
Alexandria, Virginia 22310
Phone: 703-924-0223
*Counsel for Plaintiffs Saeed Mohammadi and*
*Fatemeh Assangari*

SEEN AND AGREED:

_____

Allison Melton, VSB No. 75192
Stephen B. Wood, VSB No. 26518
BWW LAW GROUP, LLC
4520 East West Highway, Suite 200
Bethesda, MD 20814
Tel. (301) 961-6555 x4040
Fax (703) 657-6458
*Counsel for Defendant Equity Trustees, LLC*